**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**MARCUS THORNTON,**

        **Petitioner,**

  **v.**                **CIVIL ACTION NO. 2:05cv281**
                        **[ORIGINAL CRIMINAL NO. 2:01cr235]**

**UNITED STATES OF AMERICA,**

        **Respondent.**

**OPINION AND FINAL ORDER**

This matter comes before the court on petitioner's Motion to Vacate, Set Aside, or Correct Sentence, filed pursuant to 28 U.S.C. § 2255. For the reasons set forth herein, the court **DENIES** petitioner's motion.

**I.  Case History**

On July 21, 2001, Norfolk Police Officer Deion Nichols, wearing a police uniform but driving an unmarked car, became suspicious of petitioner Marcus Thornton when Thornton slowed down his vehicle to avoid passing Nichols. Nichols pulled to the side of the street to let Thornton pass him, and then ran a check on the license tag of Thornton's vehicle. The tag was issued to a 1982 Chevrolet, not the Lincoln Town Car Thornton was driving. Nichols proceeded to follow Thornton, who parked in a strip mall parking lot and exited his vehicle. Nichols stopped Thornton and asked him for his driver's license. Thornton acted nervously, rambled when

he spoke, licked his lips, and sweated.  Nichols asked Thornton if he possessed narcotics or weapons on his person.  Thornton replied negatively.  Nichols asked Thornton if he could pat him down.  Thornton consented.  Nichols felt a bulge in Thornton's pants pocket and asked him if the bulge was narcotics.  Thornton answered affirmatively.  Nichols searched Thornton and recovered three bags of marijuana and one bag of crack cocaine.  Nichols arrested Thornton and placed him in the police car.  Incident to the arrest, Nichols searched Thornton's vehicle and recovered a handgun.

On December 12, 2001, a grand jury returned a three-count indictment against Thornton.  Count One charged Thornton with Possession With Intent to Distribute Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii).  Count One carried a statutory minimum of five years.  Because Thornton had a prior drug conviction, the government could file an Information, pursuant to 21 U.S.C. § 851, that would enhance the statutory minimum from five years to ten years.  Count Two charged Thornton with being a Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).  Count Three charged Thornton with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1).  Count Three carried a statutory minimum of five years, to run consecutively with the sentences imposed for any other convictions.  Therefore, Thornton faced a statutory minimum of fifteen years, if he was convicted on all three counts.

2

Assistant Federal Public Defender Walter B. Dalton was appointed to represent Thornton. Dalton entered into plea negotiations with Laura M. Everhart, the Assistant United States Attorney prosecuting Thornton's case. On November 27, 2001, Dalton obtained a written plea agreement, under which the government agreed that it would dismiss Count Three and it would not file a § 851 Information. Consequently, Thornton faced a statutory minimum sentence of five years under the plea agreement, rather than the fifteen years he risked at trial.

Dalton reviewed the plea agreement with Thornton, who declined to accept it because it contained a clause requiring him to cooperate with the government. Thornton claims that cooperation would have endangered the lives of himself and his family. Thornton asked Dalton to obtain a plea agreement without a cooperation clause. On February 1, 2002, one week before trial was to begin, Dalton obtained such an agreement. For reasons that Thornton disputes in his § 2255 petition, he rejected the second plea agreement, and he went to trial on February 7, 2002. The jury convicted Thornton on all three counts. On May 3, 2002, the court sentenced Thornton to the statutory minimum of fifteen years. Thornton appealed on the sole ground that the search of his car, which resulted in the recovery of the handgun, violated the Fourth Amendment. The Fourth Circuit affirmed the district court's determination that Nichols conducted a constitutionally valid

3

search.  See United States v. Thornton, 325 F.3d 189, 194-96 (4th Cir. 2003).  The United States Supreme Court granted certiorari, but, on May 24, 2004, issued an opinion affirming Thornton's convictions.  See United States v. Thornton, 541 U.S. 615, 619-24 (2004).

On May 10, 2005, Thornton submitted a Motion to Vacate, Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255.[1]  On June 20, 2005, Thornton submitted a Motion to Supplement his original § 2255 motion.  On July 15, 2005, the government submitted a Response to Motion to Vacate, Set Aside, or Correct Sentence.  The government's Response included an affidavit by Dalton.  On August 8, 2005, Thornton submitted a Reply to Government's Response.  On September 13, 2005, this court issued an Order directing that an evidentiary hearing be scheduled to address ineffective assistance of counsel claims which required the court to make credibility determinations.[2]  This matter is now ripe for decision.

---

[1] Thornton signed his § 2255 motion and all other submissions under penalty of perjury, pursuant to 28 U.S.C. § 1746.

[2] See infra at 7-9.  The court would eventually convene three evidentiary hearings.  The first hearing on November 4, 2005, was continued after the court granted a Motion to Withdraw submitted by James B. Melton – an attorney appointed to represent Thornton at the evidentiary hearing – because of a breakdown in communications between Thornton and Melton.  The hearing was rescheduled for December 2, 2005, but was continued again after Kim M. Crump, Thornton's new appointed attorney, and Assistant United States Attorney Laura Everhart, asked questions and raised matters during the hearing that in effect constituted potential testimony, thereby necessitating their appearances as witnesses.  The third hearing was held on February 17, 2006, at which both Crump and Everhart

## II.  Analysis

Pursuant to 28 U.S.C. § 2255, a prisoner may submit a petition attacking a sentence imposed by a federal court.  Section 2255 provides four grounds for bringing such a challenge: (1) "the sentence was imposed in violation of the Constitution or the laws of the United States;" (2) the sentencing court did not have jurisdiction to impose the sentence; (3) the sentence exceeded the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255 (2006).  The petitioner bears the burden of proving his claim by a preponderance of the evidence.  See Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958).  When deciding a § 2255 motion, a district court need not hold a hearing if "the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255.  However, a hearing is generally required if the court must make a credibility determination in order to resolve a claim.  See United States v. White, 366 F.3d 291, 302 (4th Cir. 2004).

Thornton brings four claims alleging that Dalton provided incompetent representation in violation of Thornton's Sixth Amendment right to effective assistance of counsel.  Thornton contends that Dalton (1) failed to advise Thornton on the benefits of the plea agreements; (2) failed to advise Thornton on options other than going to trial or pleading guilty under a plea

testified.

5

agreement; (3) failed to object to the admission of incriminating statements that were the product of coercion and which were made without Thornton being advised of his <u>Miranda</u> rights; and (4) failed to object to certain drug amounts attributed to Thornton during sentencing.

To prove that his counsel provided ineffective representation, a petitioner must demonstrate that (1) his attorney's performance was deficient; and (2) the deficient performance prejudiced the petitioner by undermining the reliability of the judgment against him. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if his advice was not "reasonable[] under prevailing professional norms." <u>Id.</u> at 688. To prove prejudice, the petitioner must show a reasonable probability that, but for counsel's deficient performance, the outcome of the trial would have been different. <u>Id.</u> at 694. A <u>Strickland</u> claim fails if the petitioner does not satisfy both, the performance prong and the prejudice prong. <u>Id.</u> at 700. Thus, a court may consider only one component of the test if the petitioner does not carry his burden of proving that one prong. <u>See</u> <u>id.</u>

Thornton also raises a claim arguing that the admission of incriminating statements violated his Fifth Amendment and <u>Miranda</u> rights. Thornton further contends that the drug amounts attributed to him at sentencing violated his Fifth Amendment due process rights. However, Thornton procedurally defaulted on these claims

because he did not raise them on direct appeal.  <u>See</u> <u>United States</u> <u>v. Frady</u>, 456 U.S. 152, 165 (1982).  If a habeas petitioner defaults on a claim, he can raise the claim in a § 2255 petition only if he can "show both (1) 'cause' excusing his [] procedural default, and (2) 'actual prejudice' resulting from the [trial] errors of which he complains."  <u>Id.</u> at 167-68.  Therefore, these claims will be analyzed under the <u>Frady</u> standard.

## A.   Counsel's Alleged Failure to Advise Thornton on the Benefits of the Plea Agreement

Thornton claims that Dalton never sought a plea agreement that would not require him to cooperate.  Pet'r's Mem. Support Mot. at 8.  Thornton further asserts that Dalton failed to advise him about the existence of the second plea agreement, which deleted the cooperation clause.  § 2255 Hr'g Tr. at 36 (Dec. 2, 2005).  He argues that Dalton instead misinformed him that the government would offer a plea agreement only if he cooperated.  Pet'r's Mem. Support Mot. at 12.  Dalton allegedly also failed to advise Thornton of the benefits in the plea agreements by not informing Thornton that the plea agreements would result in a significantly shorter statutory minimum.[3]  Thornton contends that Dalton did not explain that a § 851 Information would enhance the statutory

---

[3] The reduced statutory minimum was the product of dismissing Count Three and the government agreeing not to file a § 851 Information.  <u>See</u> <u>supra</u> at 2-3.  These benefits existed in the first written plea agreement that Dalton obtained on November 27, 2001, as well as in the second agreement.  <u>See</u> <u>supra</u> at 3.

minimum for Count One to ten years, and that a conviction for Count Three imposed a consecutive five-year sentence.   Id. at 15-16. Rather, Thornton claims that Dalton told him that he faced a likely sentence of only seven-to-eight years, even if he was convicted on all three counts at trial.   Id. at 15.   Thornton asserts that if Dalton had informed him that the final agreement did not require cooperation, or that he risked a fifteen-year statutory minimum by going to trial, then he would have accepted the second agreement and he would have been subjected to a five-year statutory minimum. Id. at 10-11.

Dalton disputes Thornton's account of events.   Dalton states that he sought and obtained the second plea agreement that deleted the cooperation clause.   Dalton Aff. at 2-3, ¶ 8-9.   Dalton further expresses that he thoroughly reviewed the agreements with Thornton several times, explained to him that he would not have to cooperate under the second agreement, and repeatedly advised him to take the offer.   See id. at 1-3, ¶¶ 4 and 7-10.   However, Thornton insistently refused to accept the agreement and plead guilty.   Id. at 3, ¶¶ 9-10.   Dalton stated that on February 7, 2002, the day trial was scheduled to start, the government renewed the second plea agreement and he discussed it with Thornton.   Id. at 3, ¶ 10. However, Thornton "was indignant, and told counsel he did not want to discuss pleading guilty.   He added that, 'This is America, and I have a right to a jury trial.'"   Id.

8

Because Thornton's and Dalton's submissions, all made under oath, were in dispute, the court held three evidentiary hearings to make a credibility determination as to whose account was most accurate.[4] After observing Dalton testify twice and Thornton once, and after reviewing various exhibits and evaluating the testimony of the other witnesses, the court finds that Thornton failed to carry his burden of proving that Dalton did not advise him as to either agreement's benefits. In fact, the court finds that the evidence clearly demonstrates that Dalton informed Thornton of both plea agreements and of the advantages of pleading guilty. Dalton went over the agreements with Thornton repeatedly and thoroughly explained to him that (1) he faced a five-year statutory minimum under the agreements, but a fifteen-year minimum if he went to trial and lost on all three counts; and (2) the cooperation clause was deleted from the second agreement. Thornton still declined to accept the second plea agreement and opted for trial.

Thornton's claim is weak from the start, when he contends that Dalton never even sought to obtain a plea agreement that did not require cooperation. Dalton testified that he had six to twelve conversations with Everhart, in which he sought a removal of the cooperation clause. § 2255 Hr'g Tr. at 25 (Dec. 2, 2005). Having observed Dalton's testimony and demeanor, the court finds his statements credible. Moreover, his testimony is corroborated by

---

[4] See supra note 2.

Everhart's February 17, 2006, credible testimony,[5] as well as by government exhibit one, an actual copy of the second written agreement.  Thornton could offer no explanation as to how a written plea agreement could exist, if Dalton did not seek to obtain it. Id. at 36.  Finally, substantial evidence demonstrates that Dalton repeatedly explained to Thornton that the second agreement did not require cooperation,[6] which is evidence in and of itself that Dalton sought and obtained such an agreement.[7]

The evidence also shows that Dalton explained the benefits of the agreements to Thornton.  Dalton is an experienced and capable defense attorney who knows how to explain a plea agreement's benefits,[8] and this is a case in which the agreements were substantially advantageous.[9]  The second agreement also contained

---

[5] See infra note 10.

[6] See infra at 10-13.

[7] The court notes that at the time of Dalton's representation of Thornton, he was a seasoned defense attorney with more than ten years of experience, who had practiced many years before the court. Simply put, Dalton knew how to negotiate a modification to a proposed plea agreement.  Moreover, Thornton never even suggested that some ill motive might have prompted Dalton's alleged inaction. Dalton, in fact, represented Thornton on his appeals to the Fourth Circuit and the United States Supreme Court.  It is not believable that Dalton would have failed to seek an amended agreement deleting the cooperation clause, when his client insisted that the deletion was a necessary predicate to him pleading guilty.

[8] See supra note 7.

[9] Thornton was facing a trial in which conviction on all three counts was virtually assured due to the amount of evidence against him, see infra note 22, and in which such a guilty verdict would

the one benefit that Thornton most desired, the deletion of the cooperation clause.  It is incredulous to contend that during all of the numerous meetings Dalton had with Thornton, Dalton never would have explained the crucial benefits offered by the agreements.  Dalton credibly testified, based on specific memories of specific instances, that he repeatedly explained the agreements' benefits to Thornton.  Id. at 5, 9, 10, 14-15, 16, 17, 21, 22, and 23.  This testimony was corroborated by Everhart's February 17, 2006, testimony;[10] government exhibit two, which is an affidavit by Assistant Federal Public Defender Geremy Kamens, who states that he personally observed Dalton explain the second agreement's benefits to Thornton; government exhibit five, a statement signed by Kamens on February 7, 2002, the day of Thornton's trial, stating that Dalton thoroughly explained the second plea agreement to Thornton; and government exhibit six, which were minutes kept by Dalton demonstrating the numerous times and many hours he met with

---

have resulted in a fifteen-year statutory minimum.  See supra at 2. The plea agreements, however, would have produced a statutory minimum that would have been two-thirds less.  See supra at 3.

[10] Everhart testified that on February 7, 2002, shortly before the trial started, she approached Thornton herself and explained to him the advantages of the plea agreement and that he faced a significantly shorter statutory minimum if he pled guilty.  She also explained that he could still accept the agreement before she filed the § 851 Information.  The court finds Everhart's testimony to be credible and consistent with the other evidence introduced during the evidentiary hearings.  This testimony demonstrates that Thornton's contention that he was ignorant of the benefits of the plea agreements is meritless, and undermines the credibility of his account of the events.

Thornton the week before trial.[11]

At the same time, Thornton offered no evidence corroborating that Dalton told him he could plead guilty only if he cooperated and a trial created a risk of only a seven-to-eight year sentence.[12] Furthermore, nothing in the record reveals that Thornton objected to Dalton's performance before he submitted his § 2255 petition, despite Dalton representing him all the way to the Supreme Court on appeal. Hence, Thornton's testimony stands alone and is countered by the testimony of the prosecutor, an experienced defense

---

[11] The minutes do not specify what Dalton discussed with Thornton during these meetings. However, the minutes start on February 1, 2002, which was one week before trial began and was the day that Dalton obtained the second plea agreement. The minutes reveal that Dalton met with Thornton numerous times, for a total of more than 20 hours before the start of the trial. It is not believable that during all of such meetings, Dalton never would have discussed the benefits of such an advantageous agreement. See supra note 9 and accompanying text.

[12] Thornton's father and mother testified that they attended meetings between Dalton and Thornton, during which they discussed a plea agreement that required cooperation. However, their testimony is irrelevant because they met with Dalton only during November and December of 2001, before Dalton procured the second agreement. § 2255 Hr'g Tr. at 44-45 and 47-48 (Dec. 2, 2005). Thus, their knowledge pertains only to the conditions of the first agreement. Thornton's father even conceded that for "the great majority of the time," he did not attend Thornton's meetings with Dalton. Id. at 46. Additionally, Kim M. Crump, Thornton's attorney at the December 2, 2005, evidentiary hearing, testified on February 17, 2006, that she understood from her conversations with Dalton that the only written plea agreement was the first one. The court believes that Crump misunderstood Dalton, but her misunderstanding does not refute Dalton's credible testimony of what he repeatedly told Thornton and what Everhart told Thornton about the second plea agreement. See supra note 10 and accompanying text.

attorney, and another assistant federal public defender, as well as documentary evidence.   The court finds that Thornton failed to demonstrate that Dalton's performance was deficient by not advising him about the attendant benefits of both agreements and by failing to inform him that the second plea agreement did not require his cooperation.   This claim is **DENIED.**

### B.   Counsel's Alleged Failure to Advise Thornton of His Pleading Options

Thornton alleges that Dalton failed to inform him that he had options other than going to trial or pleading guilty pursuant to a plea agreement.   Specifically, he claims that Dalton did not tell him that he could have pled guilty without an agreement, that he could have pled <u>nolo</u> <u>contendere</u>, or that he could have pled an <u>Alford</u> plea.   Pet'r's Mem. Support Mot. at 5.   Dalton disputes this assertion,[13] but even if Dalton did not advise Thornton on these other options, Thornton fails to demonstrate any prejudice.   To the contrary, if he pled guilty under any of these other scenarios, then he would have pled guilty to Count Three, triggering its five-year consecutive sentence.   Moreover, the lack of an agreement would have allowed the government to file a § 851 Information and enhance the statutory minimum for Count One.   Therefore, Thornton failed to carry his burden of proving that he would have faced a lesser statutory minimum than he did by going to trial, and thus

---

[13] <u>See</u> Dalton Aff. at 1, ¶ 3; § 2255 Hr'g Tr. at 3 and 17-18 (Dec. 2, 2005).

the outcome of his case would have been different.

Thornton further alleges that Dalton did not inform him that he could have accepted criminal responsibility in order to obtain an acceptance of responsibility reduction to his offense level, even if the trial resulted in a guilty verdict.  Id. at 9. However, a defendant almost never receives an acceptance of responsibility reduction if he goes to trial.  See U.S.S.G. § 3E1.1, App. Note 2.  Very rare exceptions do exist, see id.; United States v. Muldoon, 931 F.2d 282, 289 (4th Cir. 1991), but none of these exceptions apply to Thornton's case.[14]  Thus, he has failed to demonstrate that there is a reasonable probability that he could have obtained the acceptance of responsibility reduction, and the outcome of his case would have been different.  This claim is **DENIED**.

**C.  Counsel's Alleged Failure to Make Coercion and Miranda Arguments**

When Nichols patted down Thornton, the officer felt a bulge in Thornton's pants pocket.  Nichols asked Thornton if the bulge was

---

[14] For example, the Guidelines Manual states that the reduction might be available to a defendant who goes to trial only to challenge the constitutionality of a statute, and not to contest factual guilt.  U.S.S.G. § 3E1.1, App. Note 2.  At his trial, Thornton did not attack the constitutionality of any statute, and he did challenge his factual guilt.  Therefore, his argument that he could have accepted responsibility and gone to trial for determination of whether his constitutional rights had been violated, see Pet'r's Mem. Support Mot. at 9, is without basis in the record.  Petitioner had the opportunity, and did so through his motion to suppress and appeals thereon, to challenge any alleged violation to his constitutional rights.

narcotics, and Thornton answered affirmatively.   Based on this response, Nichols conducted a complete search of Thornton's person and recovered three bags of marijuana and one bag of crack cocaine. Nichols arrested Thornton and searched his car incident to the arrest, recovering a handgun from the vehicle.   Thornton alleges that before he answered Nichols's question, Nichols said in reference to the bulge in Thornton's pants pocket, "If it is just some drugs[,] give it to me and I will let you go."   Pet'r's Mem. Support Mot. at 18.   Thornton argues that this alleged false promise coerced Thornton's affirmative answer.   Thornton further argues that Nichols's alleged statement converted the Terry stop into a custodial interrogation, requiring Nichols to read Miranda warnings to Thornton before Thornton answered.[15]   Thornton alleges that he told Dalton about these facts, but that Dalton failed to argue them at a January 24, 2002, suppression hearing.   Based on this failure, Thornton contends that Dalton provided ineffective assistance of counsel.   However, no Strickland claim lies here because Nichols's alleged statement did not coerce Thornton's answer or trigger his Miranda rights.   The evidence was admissible at trial and thus Thornton can demonstrate no prejudice.

---

[15] Thornton's briefs do not precisely make this argument regarding Miranda.  However, the court will liberally interpret his pro se motion on this point, see United States v. Gholson, 33 Fed. Appx. 80, 81 (4th Cir. 2002) (unpublished), and read the motion as making a Miranda argument.

### 1.  **Coercion**

The Fifth Amendment's Due Process Clause forbids a police officer from coercing a defendant into involuntarily making an incriminating statement. United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997). A statement is involuntary if, as a result of police conduct, a "defendant's will has been overborne or his capacity for self-determination critically impaired." United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (internal quotation marks and citation omitted). "Voluntariness is not...to be equated with the absolute absence of intimidation." Id. (internal quotation marks and citation omitted). "The mere existence of threats, violence, implied promises, improper influence, or other coercive activity...does not automatically render a confession involuntary." Braxton, 112 F.3d at 780. Moreover, an incriminating statement is not involuntary because a police officer uses misrepresentations to induce the confession. See, e.g., United States v. Haynes, 26 Fed. Appx. 123, 134 (4th Cir. 2001)(unpublished) (finding a confession to be voluntary even though the police fabricated a ballistics report and falsely told the defendant that his footprint was found at a crime scene). Rather, the question is whether the police officer "overpowered" the defendant's "will to resist" so that "he could not refuse" making the incriminating statement. See Braxton, 112 F.3d at 783. Consequently, a police officer must go to "extraordinary lengths"

for conduct to constitute coercion, and "very few incriminating statements...are held to be involuntary" due to coercion.  Id. at 786 (internal quotation marks and citation omitted).

A court conducts a voluntariness inquiry by examining the "totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Pelton, 835 F.2d at 1071 (internal quotation marks and citation omitted).[16] Regarding Thornton's characteristics, many factors are against him.  At the time of the incident, Thornton was a twenty-two year old adult who had obtained his General Equivalency Diploma.  He had considerable experience in dealing with police officers, including having obtained at least ten tickets for traffic violations of the sort that led to the questioning here.  Thornton alleges that he used drugs prior to the incident, making him susceptible to coercion.  However, use of narcotics is relevant only if a defendant was "so [under the influence that]...his confession was not the product of his rational intellect and free will."  See Boggs v. Bair, 892 F.2d 1193, 1198 (4th Cir. 1989).  Here, Thornton merely expresses that "there is the possibility that his inhibitions had been lowered."

---

[16] Specific relevant factors include "the defendant's age, education, level of intelligence,...the duration of questioning, the use of physical coercion or deprivation, the defendant's experience with the criminal justice system, and whether the defendant has been advised of his Miranda rights." United States v. Leonard, 1998 U.S. App. LEXIS 6816, at *11 (4th Cir. 1998) (unpublished).

Pet'r's Mem. Support Mot. at 21.  This nebulous statement provides no information regarding what drugs he used, how much, how long before he was questioned, and the extent to which the drugs impaired his ability to think.  Thus, he has failed to carry his burden to show that he was so under the influence that he could not think rationally as an intelligent adult.

The setting of the interview also weighs against Thornton. The questioning did not take place in an interrogation room at a police station, but rather was conducted in public, at a strip mall parking lot, during a routine stop for a traffic violation.  Such a setting does not constitute a coercive environment, nor do the details of the interrogation create a coercive environment. Nichols did not brandish a gun or use handcuffs.  There was no physical intimidation or threats to use force.  Nichols did not use any methods of deprivation, such as withholding water or food. While the entire detention might have lasted an hour, Thornton clearly made his incriminating statement during an early stage of the traffic stop.  See Pet'r's Mem. Support Mot. at 17-19.[17]

---

[17] Moreover, one hour is a far shorter total period of detention than in cases in which the Fourth Circuit found statements to be voluntary. See, e.g., United States v. Haynes, 26 Fed. Appx. 123, 134 (4th Cir. 2001)(unpublished)(finding statement made after sixteen-hour interview to be voluntary); see also United States ex rel. Liss v. Mancusi, 427 F.2d 225, 230 (2d Cir. 1970) (stating that an interrogation "three and a half hours in length [that] was not aggressive, leading, and compulsive," is not the kind of "long, grueling session shown in cases of over-reaching by the police").

Thornton consented to the pat down that resulted in Nichols detecting the bulge and asking the question leading to Thornton's incriminating statement.  The only factor that Thornton cites which might aid his claim is his allegation that Nichols made a false promise to release him at the point that he turned over the narcotics.  However, even if Nichols made such a misrepresentation, that one factor does not demonstrate that Thornton's statement was made involuntarily.  Nichols's alleged statement, under the totality of the circumstances, would not have so overborne Thornton's free will that he could not "resist" Nichols's question and "refuse" to answer.  See Braxton, 112 F.3d at 783.  Thornton was perfectly free to give the same negative answer that he gave prior to the pat down, or to give no answer at all.

Thornton has failed to carry his burden to demonstrate that his incriminating statement was coerced.  Thus, even if Dalton had argued that Thornton's statement and the evidence it produced should have been suppressed due to coercion, he would have failed and the statement and evidence would have been admissible.  Hence, Thornton cannot show prejudice under Strickland, and this claim is **DENIED**.

### 2.  Miranda

Before a police officer may interrogate a defendant who is held in custody, the officer must read certain warnings to the

defendant.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).[18]  "A defendant is in 'custody' for purposes of <u>Miranda</u> [only] if the person has been [formally] arrested or if his freedom of action has been curtailed to a degree associated with [formal] arrest." <u>United States v. Sullivan</u>, 138 F.3d 126, 130 (4th Cir. 1998).  If the defendant is not in custody, but rather is detained by the police officer only so that the officer may investigate suspected criminal activity, then the officer need not read <u>Miranda</u> warnings before he starts questioning the defendant.  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439-40 (1984); <u>see also</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (finding that a defendant is not in custody, and <u>Miranda</u> warnings are not required, "simply because...the questioned person is one whom the police suspect").[19]  At the January 24, 2002, suppression hearing, Dalton argued that Nichols's stop of Thornton was a custodial arrest that required the reading of <u>Miranda</u> warnings.  The court rejected this argument and denied the motion.

---

[18] These warnings are that the defendant "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to...an attorney."  <u>Miranda</u>, 384 U.S. at 444.

[19] An investigatory stop "differ[s] from custodial interrogation in that [the former] must last no longer than necessary to verify or dispel the officer's suspicion."  <u>See</u> <u>United States v. Leshuk</u>, 65 F.3d 1105, 1109 (4th Cir. 1995).  The Fourth Circuit has held that even "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest," as long as the actions were taken to execute an investigation rather than to effectuate an arrest.  <u>Id.</u> at 1109-10.

Thornton now claims that Dalton never pointed out to the court that Nichols allegedly stated, "If it is just some drugs[,] give it to me and I will let you go."  Pet'r's Mem. Support Mot. at 18. However, although "a motorist during a routine traffic stop is detained and <u>not free to leave</u>, the motorist is not 'in custody' for <u>Miranda</u> purposes," if the restriction of his freedom is not tantamount to being arrested.  <u>Sullivan</u>, 138 F.3d at 130-31 (emphasis added).[20] While executing the traffic stop, the officer may detain the motorist and conduct investigatory activities, such as requesting the motorist's driver's license and running a computer check.  <u>Id.</u> at 131.  If the officer develops a reasonable suspicion of a crime other than the traffic violation, he may further detain the motorist to question him and investigate the circumstances that gave rise to his suspicion.  <u>Id.</u>  Throughout the entire detention and investigation, the officer is not required to read <u>Miranda</u> warnings despite the fact that the motorist is not free to leave, as long as "the motorist is [not] detained to an extent analogous to an arrest."  <u>Id.</u>

Thus, the Constitution permitted Nichols to detain Thornton for committing a traffic violation, without having to read him <u>Miranda</u> warnings.  Once Nichols developed a reasonable suspicion of

---

[20] Nor is a custodial situation created because the motorist knows that he is not free to leave.  <u>See</u> <u>Leshuk</u>, 65 F.3d at 1109. In fact, a motorist typically knows that he is not free to leave the scene of a traffic stop.  <u>Sullivan</u>, 138 F.3d at 130-31.

a crime beyond the traffic violation, he was allowed to detain Nichols longer in order to investigate that suspicion.   Throughout this detention, Nichols was free to prevent Thornton from leaving, and Thornton's understanding that he could not leave did not put him in custody.   Therefore, even if Dalton argued Nichols's alleged statement, there still would have been no <u>Miranda</u> violation and the statement would have been admissible.[21]   Hence, the outcome of Thornton's case would not have been different, and he cannot prove prejudice for purposes of <u>Strickland</u>.[22]   The court **DENIES** this

---

[21] Thornton's claim that Nichols made a false promise does not alter the court's <u>Miranda</u> inquiry.   To the extent that Nichols was informing Thornton that he could not leave, a custodial situation was not created merely because Thornton was not free to leave an investigatory detention.   <u>See</u> <u>supra</u> note 20 and accompanying text. As for the part of Nichols's alleged statement that constitutes a false promise that induced Thornton's confession, that is not a factor pertinent to a <u>Miranda</u> inquiry, <u>see</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 493-96 (1977) (finding that the fact that the police lied to defendant by telling him that his fingerprints were found at the crime scene, was not relevent to "whether [defendant] was in custody for purposes of the <u>Miranda</u> rule"), but rather is a matter to be examined under a coercion analysis.   <u>See</u> <u>supra</u> at 16-19.

[22] Thornton also alleges that after Nichols arrested Thornton, Nichols told Thornton that he would be released if he revealed "where [he] got the drugs from."   Pet'r's Mem. Support Mot. at 18-19.   Nichols allegedly made this statement without reading Thornton his <u>Miranda</u> rights.   <u>Id.</u>   Thornton answered that he stole the drugs.   <u>Id.</u> at 19.   Nichols did not release Thornton.   <u>Id.</u> Thornton argues that Nichols's alleged false promise constituted coercion and violated his <u>Miranda</u> rights, but that Dalton did not argue these facts at the January 24, 2002, hearing.   <u>Id.</u>

Even if Thornton's constitutional rights were violated as he claims, and even if Dalton did not argue these allegations at the hearing, Thornton still cannot prove prejudice for purposes of <u>Strickland</u>.   To the extent the statement was used against him on the drug and gun possession charges, there is no prejudice if there is "overwhelming evidence" of guilt that still would have resulted

claim.

### D.  Drug Weights Attributed to Thornton

Thornton was sentenced to ten years on Count One, based on having possessed with intent to distribute more than five grams of crack cocaine base.  Thornton claims that during sentencing, Dalton did not argue that some, if not all, of the narcotics was for personal use rather than for distribution.  He contends that because the sentencing court found that all the drugs were for distribution, he received an Offense Level of 26, which required imposition of a minimum sentence of ten years.  Thornton states that if he was sentenced based on a finding that some of the narcotics were for personal use, then his Offense Level and sentence would have been reduced.  He contends that Dalton's failure to make the personal use argument at sentencing constitutes ineffective assistance of counsel.

However, Thornton misunderstands the process by which he was sentenced.  It was the jury, not the sentencing court, which found, beyond a reasonable doubt, that he was guilty of possession with

---

in conviction even if counsel did not err.  See Eaton v. Angelone, 139 F.3d 990, 994 (4th Cir. 1998).  The evidence was overwhelming here, which includes Thornton's pre-arrest confession; narcotics recovered from his person; and the handgun recovered from a lawful search of Thornton's car, incident to arrest.  In light of the government's strong case, there is not "a reasonable probability that [Thornton] would have escaped conviction," even if the statement was not admitted.  See id.  Thus, the outcome of the trial would have been the same, and Dalton's failure to argue about Nichols's alleged statement did not prejudice Thornton.

intent to distribute more than five grams of crack cocaine base. As Thornton himself concedes, Dalton argued the personal-use defense at trial. Pet'r's Suppl. Mem. at 1. The jury rejected this defense, as evidenced by the special verdict form, in which the jury specifically found that all narcotics found on Thornton's person were for distribution, not personal use. Furthermore, as Thornton himself again concedes, the government supported its case by presenting an expert witness who testified that the quantity and packaging of the narcotics were consistent with distribution rather than personal use. Id. It was the jury's finding that required the imposition of a ten-year statutory minimum. See 21 U.S.C. § 841(b)(1)(B)(iii) (imposing a ten-year minimum sentence for a defendant who has a prior drug conviction and who possessed with intent to distribute more than five grams of crack cocaine base). Once the jury made its finding, the sentencing court was required to apply the statutory minimum and was not free to impose a lesser sentence. See United States v. Robinson, 404 F.3d 850, 862 (4th Cir. 2005) ("Except upon motion of the Government on the basis of substantial assistance,...a district court has no discretion to impose a sentence outside of the statutory range."). Therefore, it would have been pointless for Dalton to make a personal use argument at sentencing, and Thornton suffered no prejudice on this point. The court **DENIES** Thornton's Sixth Amendment ineffective assistance of counsel claim on this ground.

24

### E.   Remaining Claims

Thornton also argues that the trial court improperly admitted two incriminating statements.  Before he was arrested, Thornton confessed that he possessed narcotics.  After he was arrested, Thornton stated that he stole the drugs.  Thornton contends that the statements were admitted in violation of his Fifth Amendment right against self-incrimination, because the statements were coerced by Nichols.  Thornton also contends that the statements were admitted in violation of Miranda v. Arizona, 384 U.S. 436 (1966), because Nichols did not read Miranda warnings to Thornton before the officer began his questioning.  However, Thornton procedurally defaulted on these claims, and thus cannot raise them here unless he can show cause and actual prejudice under Frady.  A petitioner cannot show actual prejudice, if there was no constitutional error in the first instance, because then no error occurred which could have prejudiced the outcome of his trial. See, e.g., Strickler v. Pruett, 1998 U.S. App. LEXIS 12805, at *28-31 (4th Cir. 1998) (unpublished).  Here, Thornton cannot show actual prejudice with respect to his confession that he possessed narcotics, because that statement was not coerced and was not made in violation of Miranda, and hence was properly admitted.[23]  With respect to the second statement, Thornton cannot show actual prejudice if the evidence of guilt was "overwhelming" and would

---

[23] See supra at 16-23.

25

have resulted in a guilty verdict absent the error.  See Frady, 456 U.S. at 169-72.   Here, the evidence overwhelmingly proves Thornton's guilt, and he would have been convicted even if that statement was not admitted.[24]   Therefore, Thornton cannot bring these claims here.[25]

Finally, Thornton claims that his Fifth Amendment due process rights were violated because he was sentenced based on a finding that all of the narcotics were for distribution.[26]  He does not set forth arguments or case law explaining why this alleged sentencing error implicates the Due Process Clause.   Moreover, Thornton procedurally defaulted on this Fifth Amendment claim because he failed to raise it on direct appeal.   Given that Thornton cannot show prejudice under Strickland on this claim,[27] he clearly cannot show "actual prejudice" under Frady.

**III.  Conclusion**

For the reasons stated above, petitioner's Motion to Vacate,

---

[24] See supra note 22.

[25] If a § 2255 petitioner fails to show cause and prejudice under Frady, he can still bring his claim if the evidence demonstrates that, more likely than not, he is "actually innocent" of the crimes for which he was convicted.  See Schlup v. Delo, 513 U.S. 298, 321-22 and 327 (1996).   Obviously, if Thornton cannot show prejudice under Frady because the evidence overwhelmingly proves his guilt for the drug and gun possession charges, then he cannot show that he is "actually innocent" of those charges.

[26] See supra at 23-24.

[27] See supra at 23-24.

Set Aside, or Correct Sentence, pursuant to 28 U.S.C. § 2255, is **DENIED**.  Petitioner is **ADVISED** that he may appeal from this Opinion and Final Order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510.   The written notice must be received by the Clerk within sixty (60) days from the date of this Opinion and Final Order.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Final Order to petitioner; Jon M. Babineau, petitioner's counsel; Walter B. Dalton, James B. Melton, and Kim M. Crump, petitioner's former counsel; and to Assistant United States Attorneys Laura M. Everhart and Sherrie S. Capotosto.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith

Norfolk, Virginia

April 10, 2006